IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 21-10519 (JTD) |
| SC SJ HOLDINGS, LLC, et al., | ) | Case No. 25-10189 (JTD) |
| | ) | Bankr. Case No. 25-10194 (JTD) |
| Debtors. | ) | (Bankr. D. Del.) |
| SJ SC HOLDINGS, LLC and NEX SJ, LLC, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-150 (MN) |
| | ) | |
| BRIGHTSPIRE CREDIT 1, LLC, | ) | |
| | ) | |
| Appellee. | ) | |
| SJ SC HOLDINGS, LLC, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-151 (MN) |
| | ) | |
| BRIGHTSPIRE CREDIT 1, LLC, | ) | |
| | ) | |
| Appellee. | ) | |
| NEX SJ, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 25-176 (MN) |
| BRIGHTSPIRE CREDIT 1, LLC, | ) | |
| | ) | |
| Appellee. | ) | |

## <u>MEMORANDUM OPINION</u>

Jeffrey S. Cianciulli, WEIR LLP, Wilmington, DE— Counsel to appellants, SC SJ Holdings, LLC and NEX SJ, LLC.

Derek C. Abbot, Brianna N.V. Turner, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Jeffrey C. Krause, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, CA—Counsel to appellee, Brightspire Credit 1, LLC.

March 17, 2026
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

SC SJ Holdings, LLC ("SC SJ"), together with certain affiliates, filed Chapter 11 cases in 2021 and eventually confirmed a plan of reorganization. *In re SC SJ Holdings LLC, et al.,* Case No. 21-10549 (JTD) ("the First Bankruptcy Case"). In 2024, SC SJ and NEX SJ, LLC ("NEX" and together with SC SJ, "the Debtors") filed Chapter 11 cases in the U.S. Bankruptcy Court for the Northern District of California ("the California Court") (Case Nos. 24-51683-SLJ and 24-51685-SLJ) ("the 2024 Cases"). Pending before this Court are three separate notices of appeal[1] filed by the Debtors with respect to a series of orders issued by the Bankruptcy Court in the above-captioned cases, which were entered for the reasons set forth in its January 30, 2025 decision (Bankr. D.I. 1312; D.I. 1-1)[2] ("the Memorandum Opinion").

By its Order dated February 4, 2025 (Bankr. D.I. 1326; D.I. 1-2) ("the Transfer Order"), the Bankruptcy Court granted the motion of appellee Brightspire Credit 1, LLC ("the Lender") and transferred the two 2024 Cases to the District of Delaware, pursuant to Federal Rule of Bankruptcy Procedure 1014(b) and 28 U.S.C. § 1412. Pursuant to its February 11, 2025 Order Dismissing Bad Faith Chapter 11 Cases (Bankr. D.I. 1334; D.I. 10) ("the Dismissal Order"), the Bankruptcy Court dismissed the 2024 Cases as having been filed in bad faith for the purpose of modifying the plan confirmed in the First Bankruptcy Case.[3]

---

[1]     Debtors filed three appellate briefs that are for the most part identical, except that the briefs in C.A. 25-151 (MN) and 25-176 (MN) contain an additional one-page argument in Section V.G. applicable to NEX SJ. Appellee has submitted an identical answering brief in each of the three appeals.

[2]     For ease of reference, unless otherwise noted, all citations shall be to the docket of the appeal pending under C.A. No. 25-150 (MN), which is cited herein as "D.I. __"

[3]     The docket of the First Bankruptcy Case, *In re SC SJ Holdings LLC, et al.,* Case No. 21-10549 (JTD), is cited as "Bankr. D.I. __."

1

Debtors argue that the Bankruptcy Court abused its discretion in transferring and dismissing the 2024 Cases based on improper evidentiary rulings and findings.[4]  For the reasons set forth below, the Transfer Order and Dismissal Order will be affirmed.

## I.    BACKGROUND

### A.    The First Bankruptcy Case

In 2018, the predecessor of Lender made a loan ("the Prepetition Secured Loan") to SC SJ and its original tenant, FMT SJ, LLC ("FMT," and, together with SC SJ, "the Original Debtors"). The Original Debtors used the proceeds of the Prepetition Secured Loan to acquire a hotel located in San Jose, California ("the Hotel").  The Prepetition Secured Loan was secured by substantially all of the Original Debtors' assets.

In March of 2021, the Original Debtors filed Chapter 11 petitions in the Bankruptcy Court, commencing the First Bankruptcy Case.  SC SJ was the owner of the Hotel.  FMT was lessee of the Hotel.  Lender cooperated with the Original Debtors and ultimately voted to accept the *Third Amended Joint Chapter 11 Plan of Reorganization* (with all supplements and exhibits thereto, "the Plan") in the First Bankruptcy Case.  On August 18, 2021, the Bankruptcy Court entered an order ("Confirmation Order") confirming the Plan. (App.000184; App.002632).[5]  The Effective Date of the Plan occurred on November 8, 2021.  (App.002760).  Consistent with the Plan, FMT was liquidated and NEX was formed to take over as the Hotel's new tenant.  SCSJ, FMT, and NEX (collectively "Debtors") are all owned by Sam Hirbod ("Mr. Hirbod").

---

[4]    The Debtors further list, in each notice of appeal, the Bankruptcy Court's orders denying reconsideration of the Dismissal Order (Bankr. D.I. 1338 ("2/4/2025 Tr.") at 38:17-23) and denying Debtors' motion for a stay pending appeal of the Dismissal Order (*id*. at 39:6-22). *See* D.I. 1 at 1.

[5]    The appendix (D.I. 20) submitted in support of Debtors' opening brief is cited as "App.__".

Two of the classes of claims addressed in the Plan concerned the Original Loan: the SC SJ Prepetition Secured Loan Claim (Class 3(A)), and the FMT Prepetition Secured Loan Claim (Class 3(B)). (App.002535-2536). Section 4.3 of the Plan, which addresses the treatment of the SC SJ Prepetition Secured Loan Claim, provides that:

> On the Effective Date or as soon as reasonably practicable thereafter: the Prepetition Secured Lender will release its right to receive Default Interest and shall receive, on account of the SC SJ Prepetition Secured Loan Claim (i) payment in Cash of any unpaid reasonable costs and expenses owed pursuant to the Restructuring Support Agreement, Prepetition Secured Loan Documents, or Financing Orders incurred prior to the Effective Date; and (ii) payment in full over time of the Post-Effective Date Secured Loan Amount by Reorganized SC SJ pursuant to the Post-Effective Date Secured Loan Documents, which shall be delivered on or before the Effective Date.

(App.002535). Section 4.4 of the Plan, which addresses the treatment of the FMT Prepetition Secured Loan Claim, provides that:

> On the Effective Date or as soon as reasonably practicable thereafter, the Prepetition Secured Lender shall receive, on account of the FMT Prepetition Secured Loan Claim, the FMT Collateral Payment, and all Prepetition FMT Collateral, other than cash collateral, shall be delivered in kind to Reorganized SC SJ and repayment of the debt secured by the Prepetition FMT Collateral shall be made over time by Reorganized SC SJ pursuant to the Post-Effective Date Secured Loan Documents.

(App.002535-2536). The "Post-Effective Date Secured Loan Documents" referenced in Sections 4.3 and 4.4 of the Plan were entered into as of November 8, 2021 by and between Lender and SC SJ and NEX SJ, as borrowers, and include the Amended and Restated Promissory Note, Amended and Restated Loan Agreement, and an Amended and Restated Deed of Trust, Security Agreement, Assignment of Leases and Fixture Filing (collectively, "the Loan Documents"). Pursuant to the Loan Documents, the accrued unpaid interest and fees associated with the Prepetition Secured Loan, all due and payable, were capitalized into the balance owing under the modified loan, which on the

3

effective date of the Plan, would have an aggregate debt of $184,953,169.21 ("the Plan Loan"). The Loan Documents also modified the payment terms of the Prepetition Secured Loan.

### B.    Plan Treatment of the Prepetition Secured Loan

Relevant to the appeals, Lender asserts that the Plan, the Confirmation Order, and the Loan Documents executed pursuant to and incorporated by reference into the Confirmation Order, modified the terms of repayment of the Prepetition Secured Loan (as modified by the Plan, Confirmation Order, and the Amended & Restated Loan Agreement and other amended and restated loan documents executed pursuant to the Plan and Confirmation Order, "the Plan Loan"). Debtors, on the other hand, argue that the Prepetition Secured Loan was deemed to have been satisfied under the Plan, so the Debtors' obligations at the time of the filing of the 2024 Cases were owed under entirely new post-confirmation debt not governed by the Plan. (App. 003403, App. 003452-3453). The Bankruptcy Court determined that the Loan Documents and testimony leading up to confirmation demonstrate that the Debtors understood and intended for the Plan and resulting Plan Loan to modify the Prepetition Secured Loan. (Mem. Op. at 8).

No new money was advanced under the Loan Documents. Rather, the Plan capitalized accrued and unpaid interest and fees, which were then all due and payable, into the balance owing under the Plan Loan, modifying the payment terms to require payment of interest only, and extending the maturity date by three years to November 2024.

Sam Hirbod, President of the indirect owner of the Debtors ("Mr. Hirbod"), testified in support of plan confirmation that (1) "The Prepetition Secured Creditor . . . agreed to a restructuring of the Prepetition Secured Loan by, among other things, extending the maturity date," and (2) "the Prepetition Secured Loan will be amended via the execution of the Post-Effective Date Secured Loan Documents . . .." (App.003163 and App.003166).

4

The Confirmation Order provides, "[t]he Plan Documents are essential elements of the Plan . . . are incorporated by reference, are approved in all respects, and constitute an integral part of this Confirmation Order."  (App.002648).  The Plan Documents are defined as including "The Plan and the documents contained in or contemplated by the Plan, including but not limited to . . . the Post-Effective Date Secured Loan Agreement."  (App.002642).

The Plan itself expressly states that "all documents executed, delivered, assumed, or performed in connection with the occurrence of the Effective date," which would include the Loan Documents, "are incorporated into and are a part of the Plan as if set forth in full in the Plan."

The Loan Documents indicate that they were entered into to enable the implementation of the Plan.  For example, the Amended & Restated Loan Agreement provides that "WHEREAS, on August 18, 2021, the Bankruptcy Court entered the Confirmation Order . . . , which Confirmation Order inter alia authorized and approved Borrower's entry into and performance under this Agreement . . .".  Likewise, the Amended and Restated Promissory Note states that "[p]ursuant to the terms of the Plan of Reorganization and Confirmation Order, [the parties] intend to enter into that certain Amended and Restated Loan Agreement . . . .".  Conditions precedent to the Plan's effectiveness included "the Post-Effective Date Secured Loan Documents [*i.e.* the Amended & Restated Loan Agreement] shall have been executed and delivered by all of the Persons that are party thereto."  (App.000237).  The Loan Documents each state that they are being entered into to implement the Plan.  (App.003411).

C.       **Sale of the South Tower and Release of Lien**

Following confirmation, the Debtors struggled to meet their obligations under the Plan. Debtors sought Lender's consent to Debtors' sale of the South Tower of the Hotel[6] for $73,100,000.00, a release of Lender's lien on the South Tower, and the diversion of part of the proceeds of that sale to pay closing costs, brokers' fees, and unpaid real estate taxes, even though 100% of such proceeds were part of the Lender's collateral.  In a letter dated November 13, 2023 (App.003385) ("the Side Letter"), Lender agreed to release its lien on part of the cash proceeds if Debtors used part of these proceeds to reduce the Plan Loan. (*Id.*).  Lender also allowed Debtors to fund an "Interest Shortfall Reserve Account" to fund payment of interest from the Lender's own cash collateral, which could be used by Debtors solely to keep the Plan Loan (and a mezzanine loan) current going forward. (*See id.*).  These concessions by Lender gave Debtors additional time to sell or refinance the remainder of the Hotel (*i.e.*, "the North Tower").  Pursuant to the Side Letter, Debtors agreed to market the remainder of the Hotel based on a mutually agreed upon, consensual timeline, with closing of a sale and payoff of the Plan Loan not later than April 30, 2024. (App.003386–3387).

During negotiations, the Debtors communicated to the Lender that listing the North Tower at that moment would send a message to potential buyers that this was a distressed sale, severely diminishing the chances of attracting competitive bid, as the North Tower renovations had not been completed, and market conditions at the time were not conducive to a successful sale. (*See* App.001487–1491).  Lender responded that if Debtors did not sign the Side Letter, Lender would block the sale of the South Tower.  Debtors argue on appeal that the Lender's demand to

---

[6]      The Hotel (and collateral) included both the South Tower and a North Tower when the Prepetition Secured Loan was first funded and when it was modified by the Plan.  Lender had the right to receive 100% of the sale proceeds upon any sale of the South Tower.

immediately place the North Tower on the market following the sale of the South Tower was "an unreasonable and impractical demand" made "in bad faith," that constituted an unforeseeable changed circumstance, and that Debtors signed the Side Letter "under duress." (*See* D.I. 20 at 16).

The North Tower was listed with CBRE, but it did not receive any written bids. (App.001497). Debtors pushed forward and completed the renovations to the North Tower in March 2024. (*See id.*). Once the renovation was done, Debtors began actively seeking refinancing options. (*See id.*). Debtors' brief explains that traditional lenders required a 12-month track record of strong performance before they would offer competitive financing terms. (*See id.*). Accordingly, Debtors explored bridge financing options, but, unfortunately, those negotiations failed. (*See* App. 001496-1499).

**D.      The September 2024 Settlement Agreement and Additional Extension**

It is undisputed that the Debtors defaulted under the Plan Loan. The Debtors failed to pay part of the interest that was due on June 8, 2024, and never paid any interest after that date. Lender recorded a notice of default on July 5, 2024.

On September 12, 2024, the parties entered into a Settlement Agreement and Release (App.003394), pursuant to which the Lender gave the Debtors additional time to close on a take-out loan from a third party with whom Debtors were negotiating. In exchange, the Debtors agreed to a reduced final balance and an extended payoff date, and admitted, *inter alia*, the following:

> (a) the [Debtors] have defaulted under the Loan Agreement, (b) as the result of the [Debtors'] default Lender had the right to declare a default and accelerate the balance due under the Loan Documents, (c) the Lender has properly recorded and served the Notice of Default . . ., [and] (d) the Notice of Default is valid and effective . . ..

(*Id.*). On September 25, 2024, Debtors filed a Motion for Entry of a Final Decree and Order Closing Chapter 11 Cases (Bankr. D.I. 1259) ("the Motion to Close") in the First Bankruptcy Case, which

argued that the estate had been fully administered.  Lender objected.  (Bankr. D.I. 1267).  Before a hearing could be held, the Debtors filed the 2024 Cases.

Despite Debtors' defaults under the Plan, Lender gave Debtors more time to close a take-out loan, which Debtors represented to Lender they would finalize before October 11, 2024, the proceeds of which would be used to pay Lender.  Lender further agreed to accept a discount on the total payoff amount due to it on the condition it was paid by October 11, 2024, as the net loan proceeds from the proposed refinancing would not have been sufficient to pay Lender in full.  (*Id*.).  In exchange for concessions by Lender, Debtors released all claims that they might theoretically assert against Lender, including, but not limited to, any claims that the Side Letter or process leading up to the Side letter was improper.  (App.003395–3396).  After Debtors entered into the Settlement Agreement and Release, Debtors decided not to proceed with the proposed take-out financing based on their view that it was too burdensome.  (App.000859–860).  When Debtors failed to pay Lender by the extended date, Lender scheduled a foreclosure sale for November 6, 2024.

Debtors obtained an appraisal of the Hotel from HVS Consulting & Valuation, which provides, among other values, an "As Is" value of $217,400,000 for the Hotel as of October 16, 2024 (App. 003170-3172) ("the Appraisal").  Debtors assert "the Appraisal demonstrates that the value of the Hotel was well in excess of the amount that was due [under the Plan Loan] and evidenced the positive result from the [Debtors'] extensive efforts."  (D.I. 20 at 18).

### E.      The Filing of the 2024 Cases and the Motion to Dismiss

On the day before the scheduled foreclosure sale, Debtors filed the 2024 Cases in the California Court.  Lender asserts that these cases were filed to prevent Lender from enforcing its remedies under the Plan Loan.  (App.000767; App.000784).  Lender further asserts that the Debtors filed the 2024 Cases in the California Court, rather than returning to the Bankruptcy Court, because they had no right to modify the Plan on which Lender had relied.  Debtors, on the other hand, assert

8

that their goal in filing the California Bankruptcy Cases was to work with their stakeholders to restructure the New Loan and secure the necessary financing to stabilize the Hotel and ensure its long-term success. (D.I. 20 at 18).

Lender filed the *Motion by Lender to Transfer Chapter 11 Cases to This Court and Dismiss Bad Faith Chapter 11 Cases* (App.000826) ("the Motion to Dismiss") arguing that the cases were filed in bad faith in an attempt to modify the substantially consummated Plan. Debtors filed an Objection asserting that the loan to be restructured in the California Bankruptcy Cases was new debt not subject to the Plan and thus the California Bankruptcy Cases were not an attempt to modify the Plan. (App.000853).

The Motion to Dismiss was originally calendared for hearing on December 4, 2024. The Debtors sought discovery, and the hearing was postponed to December 19, 2024. The Debtors demanded 16 categories of documents and an examination of witnesses on 30 separate categories of information. At a hearing on the discovery dispute, Debtors' counsel indicated that they had reconsidered their position, needed even more discovery, and that the hearing, which they had stipulated would proceed on December 19, 2024, should be continued again or treated as only a status conference. (App.001345). The Bankruptcy Court denied Debtors' request for another postponement but ordered certain categories of discovery, which Debtors characterize as "limited."

On December 19, 2024, the Bankruptcy Court conducted an evidentiary hearing on the Motion to Dismiss. (*See* App.001424). Debtors argued that the Bankruptcy Court had not allowed sufficient discovery and that it should not rule yet, but rather, should find there are genuine disputes as to material facts that required more discovery.

On January 30, 2025, the Bankruptcy Court issued its thorough Memorandum Opinion granting the Motion to Dismiss on the basis that the 2024 Cases were filed in bad faith for the sole purpose of preventing Lender from exercising the remedies it was granted under the Plan and

9

Confirmation Order in violation of Section 1127(b).  (Bankr. D.I. 1312; App.001566).  The Bankruptcy Court subsequently denied Debtors' Motion for Reconsideration.  (2/4/2025 Tr. at 38:17-23).  Both the Bankruptcy Court and this Court have further denied Debtors' requests for a stay pending appeal.  (*Id.* at 38:17-23; D.I. 9).  On February 4, 2025, the Bankruptcy Court entered the Transfer Order, transferring the two 2024 Cases from the California Court to the District of Delaware.  On February 11, 2025, the Bankruptcy Court entered the Dismissal Order, dismissing the 2024 cases.  Debtors filed timely notices of appeal.

The appeals are fully briefed.  (D.I. 20, 22, 23).  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).  A bankruptcy court's dismissal of a Chapter 11 case is a final order.  *In re Allegiance Coal USA Ltd.*, 2025 WL 951932, at *7 (D. Del. Mar. 31, 2025).

The Bankruptcy Court's decision to transfer the 2024 Cases to Delaware is reviewed for abuse of discretion.  *In re Bula Devs., Inc.*, 666 B.R. 922, 927 (Bankr. E.D. Cal. 2025) ("The transfer decision is committed to the court's discretion and is reviewed for abuse of discretion").  The Bankruptcy Court's decision to dismiss the 2024 Cases is also reviewed for abuse of discretion.  *In re Stingfree Techs. Co.*, 427 B.R. 337, 352 (E.D. Pa. 2010) (citing *In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999)) ("The decision to dismiss a Chapter 11 petition is reviewed for abuse of discretion"); *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) (same).

Lender raises one additional jurisdictional issue.  Following the entry of the Transfer Order and Dismissal Order, Lender foreclosed on the Hotel under California law on May 12, 2025.  As Lender points out, even if this Court were to reverse the Dismissal Order, as Debtors have requested

(*see* D.I. 20 at 45), such reversal would not retroactively reinstate the automatic stay or invalidate the sale that was completed at a time when no stay was in effect. Thus, it is unclear what effective remedy is available in connection with these appeals. Indeed, Debtors offer no response to Lender's contention that the appeal may be equitably moot. (*See* D.I. 20). That said, Debtors have filed a lawsuit in the California Superior Court seeking to void the sale or award them damages based on allegations that the sale did not comply with applicable law. As the Lender chose not to move for dismissal on the grounds of mootness, the Court addresses the appeals on the merits.

## III.   ANALYSIS

### A.   Transfer of the 2024 Cases to the Bankruptcy Court Was Not an Abuse of Discretion

Rule 1014(b) of the Federal Rules of Bankruptcy Procedure provides as follows:

> If petitions commencing cases . . . are filed in different districts by . . .
> (A) the same debtor . . . or (D) a debtor and an affiliate . . . [t]he court
> in the district where the first petition is filed may determine the district
> or districts in which the cases should proceed in the interest of justice
> or for the convenience of the parties.

Fed. R. Bankr. P. 1014(b). The Debtors objected to transfer of the 2024 Cases, arguing that Rule 1014(b) was not triggered because the First Bankruptcy Case was fully administered and should be closed. (Bankr. D.I. 1259). Alternatively, the Debtors argued that even if Bankruptcy Rule 1014(b) applied, the Bankruptcy Court should decline to transfer the 2024 Cases because: (1) the interests of justice favor allowing the Debtors to proceed in their chosen forum; and (2) the debt to be restructured in the 2024 Cases is new debt not governed by the Plan. The Bankruptcy Court disagreed, based on the documentary evidence which demonstrated that the Plan Loan "is not new debt but is a modification of the [Prepetition Secured] Loan that is governed by the Plan," and the "case is not yet ripe for a final decree." (Mem. Op. at 5-6). It further held that the interests of justice favored the transfer of the 2024 Cases to the Bankruptcy Court. (*Id*. at 6).

Although Debtors list the Transfer Order in their Notice of Appeal, their opening brief does not offer any arguments to support its reversal. (*See* D.I. 20). Here, the threshold issue presented by Debtors' opposition to Lender's Motion to Dismiss—whether the debt to be restructured in the 2024 Cases was governed by the Plan—required the interpretation of the Plan and the Bankruptcy Court's Confirmation Order. Unlike the California Court, the Bankruptcy Court was familiar with the First Bankruptcy Case, the Hotel, and the parties' rights under the Plan and the Confirmation Order. The Bankruptcy Court had expressly retained jurisdiction to, *inter alia*, interpret and enforce the Confirmation Order and the Plan. (*See* App.000249 (Requests to modify the Plan); *id*. (disputes over enforcement of the Plan, the Confirmation Order and the Plan Loan)). The Bankruptcy Court did not abuse its discretion in transferring the 2024 Cases.

**B.    Dismissal of the 2024 Cases Was Not an Abuse of Discretion**

Because the Debtors relied on voluminous documents in their opposition to Lender's motion to dismiss the 2024 Cases, the Bankruptcy Court advised the parties at a status conference that it would be treated as a motion for summary judgment.[7] (*See* Mem. Op. at 6). An evidentiary hearing was held on December 19, 2024. (Bankr. D.I. 1303). Pursuant to Rule 56, a movant is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is thus proper "where the facts are undisputed and only one conclusion may reasonably be drawn from them." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985). "[A]t the summary judgment stage[,] the

---

[7]    *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016) ("If other 'matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.'") (quoting Fed. R. Civ. P. 12(d)). 5C Charles Alan Wright et al., *Fed. Prac. & Proc. Civ.* § 1366 (3d ed.) ("The element that triggers the conversion [from a Rule 12(b)(6) dismissal motion into a Rule 56 motion for summary judgment] is a challenge to the sufficiency of the pleader's claim supported by extra-pleading material.").

judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Lenders argued that the 2024 Cases should be dismissed as a bad faith filing pursuant to Section 1112(b) of the Code. Section 1112 of the Bankruptcy Code provides that a chapter 11 petition may be dismissed for "cause." 11 U.S.C. § 1112(b)(1). The Third Circuit has held that "cause" includes petitions not filed in good faith. *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),* 200 F.3d 154, 160 (3d Cir. 1999) ("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith."). The burden is on the debtor to establish that it filed its petition in good faith. *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298 (Bankr. D. Del. 2011) (citing *In re 15375 Memorial Corp.*, 589 F.3d 605, 609, 618 (3d Cir. 2009)).

Lenders argued that the 2024 Cases were filed in bad faith because they were filed for the sole purpose of modifying the Plan in violation of Section 1127(b). Section 1127(b) prohibits the modification of a plan once it has been substantially consummated. 11 U.S.C. § 1127(b) ("[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan . . ..").

As the Bankruptcy Court explained, "chapter 11 filings made for the purpose of modifying a previously confirmed and substantially consummated plan in violation of Section 1127(b) of the Code are made in bad faith and must be dismissed under Section 1112(b) of the Code." (Mem. Op. at 7). *See e.g., In re Northampton Corporation*, 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984) ("the filing of a chapter 11 petition, with an eye toward curing defaults arising under a previously confirmed chapter 11 plan, is so akin to modifying the previous plan" that it was impermissible and constituted "cause" to dismiss or convert the second case under Bankruptcy Code § 1112).

13

Debtors argued that the 2024 Cases were distinguishable because (1) the debt they were seeking to restructure was not governed by the Plan but was rather entirely new post-confirmation debt; and (2) even assuming that the Bankruptcy Court found the Debtors were seeking to modify the Plan through the 2024 Cases, there were unforeseen changed circumstances that warranted modification, so the 2024 Cases were filed in good faith.

> **1.    Debtors Have Shown No Error in the Bankruptcy Court's Determination that the Debt they Sought to Restructure in the 2024 Cases Is Governed by the Plan**

As an initial matter, the Court agrees with the Lender that the Plan Loan was clearly incorporated into the Plan and Confirmation Order, regardless of whether it is a "new loan" or an "Amended & Restated Loan." Either way, the Plan Loan is governed by the Plan.

Addressing the Debtors' argument, the Bankruptcy Court held that "it is clear from the record in this case that the [Plan] Loan arose out of the First Bankruptcy Case and is therefore governed by the Plan." (Mem. Op. at 8). The Bankruptcy Court cited the "Debtors' own documents and testimony leading up to confirmation" which "demonstrate that the Debtors understood and intended for the Plan and resulting Post-Confirmation Loan to modify the Original Loan." (*Id.*). As the Bankruptcy Court explained:

> the Plan itself expressly states that "all documents executed, delivered, assumed, or performed in connection with the occurrence of the Effective date," which would include the Loan Documents, "<u>are incorporated into and are a part of the Plan as if set forth in full in the Plan</u>." Similarly, the Confirmation Order states that the "Plan Documents" (defined as including, among other things, the Post-Effective Date Secured Loan Agreement) are <u>incorporated by reference</u>, are approved in all respects, and <u>constitute an integral part of this Confirmation Order</u>. …
>
> [T]he Loan Documents indicate that they were entered into to enable the implementation of the Plan. For example, the Amended & Restated Loan Agreement ("Loan Agreement") provides that "WHEREAS, on August 18, 2021, the Bankruptcy Court entered the Confirmation Order . . . , <u>which Confirmation Order inter alia</u>

14

> authorized and approved Borrower's entry into and performance under this Agreement . . .".  Likewise, the Amended and Restated Promissory Note states that "[p]ursuant to the terms of the Plan of Reorganization and Confirmation Order, [the parties] intend to enter into that certain Amended and Restated Loan Agreement . . . .".

(Mem. Op. at 9 (emphasis in original) (footnotes omitted)).  The Bankruptcy Court further cited Mr. Hirbod's Declaration in Support of Confirmation.  (*Id*. at 8).  The Bankruptcy Court concluded that "[t]his evidence all supports the conclusion that the [Plan] Loan is not new debt that came into existence independent of the First Bankruptcy Case, but rather was a product of the bankruptcy process."  (*Id*. at 9).  This Court agrees that the Plan Documents support the Bankruptcy Court's conclusion.

Debtors argue on appeal that the Bankruptcy Court erred by ignoring "substantial evidence" that the Plan Loan was "new debt" not governed by the Plan.  (D.I. 20 at 30).  The evidence Debtors claim that the Bankruptcy Court ignored, however, appears to be (1) the Plan Documents, which the Memorandum Opinion carefully considered, and (2) Mr. Hirbod's testimony upon direct examination at the hearing on the Motion to Dismiss that he understood the Post-Confirmation Loan to be entirely new debt.

With respect to the Plan Documents, Debtors argue the Bankruptcy Cout ignored that their "obligations under the [Prepetition Secured] Loan, which [were] adjusted by the Plan, were fully paid in accordance with the Post-Effective Date Secured Loan Documents" and the Plan Loan, "did not arise until immediately following the Effective Date" (*id.* at 31).  Debtors rely on the following language: "[o]n the Closing Date, the full amount of the Loan, in the amount of $184,953,169.21, shall be deemed to have been advanced by Lender to Borrower under this Agreement, in full satisfaction of the amounts made available under the Prepetition Loan Agreement."  (Bankr. D.I. 1280-2).  The Bankruptcy Court rejected Debtors' argument that this language must be

15

interpreted to mean that the Plan Loan proceeds were used to extinguish the Prepetition Secured Loan, as that interpretation:

> would require [the Court] to ignore the remainder of that provision, which plainly states that "[t]he Loan deemed made pursuant to this Section 2.1.2 shall be deemed made without any actual funding." In other words, the [Plan] Loan issued no proceeds at all because the full amount had been issued prepetition in connection with the [Prepetition Secured] Loan.

(Mem. Op. at 10 (citing Bankr. D.I. 1280-2 at p. 81)). This Court agrees that the plain meaning of the provision cited by Debtors supports that the Plan Loan is an amendment.

Debtors argue that the Bankruptcy Court further ignored that NEX, "which is not a debtor in the [First] Bankruptcy Case, is a co-borrower under the [Plan] Loan," and NEX "is not specifically referenced anywhere in the Plan," which must be read to demonstrate that the Plan Loan is a new loan. (*See* D.I. 20 at 31-32). But as the Bankruptcy Court observed, "the Plan clearly contemplates that the new tenant of the Hotel—an entity that would be formed post-confirmation—would be co-borrower on the Plan Loans." (Mem. Op. at 10 (citing Bankr. D.I. 660 at 11 (defining the term "other Post-Effective date Loan Amendment" as "an amendment to the Prepetition Secured Loan, to be entered into by the Prepetition Secured Lender, SC SJ, and the New Lessee on the Effective Date . . .."))). "As the new lessee," the Bankruptcy Court concluded, "NEX's inclusion on the Loan Documents is entirely consistent with this provision." (*Id.*).

This Court agrees with the Bankruptcy Court that Debtors take "these snippets of the record out of context" and otherwise ignore evidence that conflicts with their narrative that the Plan Loan is a new loan. Debtors have not shown any error in the Bankruptcy Court's determinations "that [Plan] Loan is debt that was restructured in the First Bankruptcy Case and therefore subject to the Plan," and that the 2024 Cases, which Debtors have stated was filed for the purpose of restructuring

16

the Plan Loan, would have the effect of modifying the substantially consummated Plan, contrary to the provisions of section 1127(b) of the Bankruptcy Code. (Mem. Op. at 11).

Debtors further argue that Mr. Hirbod's testimony that he understood the Plan Loan to be new debt was sufficient to create a genuine dispute of material fact as to whether the Plan Loan was new debt not governed by the Plan, but the Bankruptcy Court made a credibility determination that was improper in a summary judgment proceeding, and therefore erred in granting the Motion to Dismiss the 2024 Cases. (*See* D.I. 20 at 25). This Court disagrees.

With respect to Mr. Hirbod's testimony that he understood the Plan Loan to be new debt, it was not inappropriate for the Bankruptcy Court to comment on his credibility as part of its overall conclusion that there was no genuine dispute as to any material issue of fact. Mr. Hirbod, in his prior declaration in support of confirmation of the Plan and entry of the Confirmation Order, had testified that, "pursuant to the Plan the Prepetition Secured Loan [was] amended via the execution of the Post-Effective Date Secured Loan Documents by the Prepetition Secured Lender, Debtor SC SJ, and New Lessee on the Effective Date" and that "[t]he Post-Effective Date Secured Loan Documents will, among other things, extend the maturity date of the Prepetition Secured Loan until three years after the Effective Date . . .." (App.003163).

That Mr. Hirbod's contradictory testimony on this subject was not credible did not matter to the Bankruptcy Court's ultimate conclusion—indeed, his testimony was unnecessary under the parole evidence rule because the Confirmation Order and Loan Documents are clear on their face. (*See* Mem. Op. at 11 ("[Mr. Hirbod's] testimony is not credible considering all the documentary evidence to the contrary," which included "the documents discussed above that were created in connection with the First Bankruptcy Case.")). Thus, the Bankruptcy Court did not err in disregarding Mr. Hirbod's new testimony as inconsistent with his earlier testimony in support of confirmation and the operative documents, Plan and Confirmation Order, which was not sufficient

17

to establish a genuine dispute as to any material fact. *See Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) ("When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists. '[T]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit.'") (citing *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir. 1988)).

Ultimately, there was no dispute as to the material facts that (a) the entire Prepetition Secured Loan was due and payable before the Plan modified the repayment terms, (b) the Plan Loan is exactly equal to the Prepetition Secured Loan, including accruals, (c) on the Effective Date, the Plan provided for the conversion of the Prepetition Secured Loan into the Plan Loan, (d) no new advances were made at that time, (e) no debt was paid down, and (f) no new collateral was granted. The Bankruptcy Court did not err in reaching its judgment based on the documentary evidence.

### 2. Unforeseen Changed Circumstances Did Not Warrant the Filing of the 2024 Cases

Debtors argued that, even if the Bankruptcy Court were to find that the 2024 Bankruptcy Cases were filed for purposes of modifying the Plan, unforeseen changed circumstances permitted the Debtors to file the 2024 Cases. The Debtors relied on cases permitting modification of a plan for "unanticipated changed circumstances." *See, e.g., In re Woodson*, 213 B.R. 404, 406 (Bankr. M.D. Fla. 1997) (finding substantial changes in circumstances had occurred which were unanticipated at the time of confirmation in the first case and therefore denying creditor's motion to dismiss the second bankruptcy case.)

The Bankruptcy Court rejected this argument, noting that, as a threshold matter, "[t]he plain text of § 1127(b) does not provide any exception to the requirement that modification must be requested before substantial confirmation. Congress decided that the timing requirement applies

18

regardless of the circumstances." *SC SJ Holdings, LLC v. Pillsbury Winthrop Shaw Pittman LLP (In re SC SJ Holdings, LLC),* 2023 U.S. Dist. LEXIS 48320, at \*21 (D. Del. Mar. 22, 2023). As held in a prior decision:

> Section 1127(b) states, in relevant part, that "[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and **before substantial consummation of such plan**." 11 U.S.C. § 1127(b) (emphasis added). Accordingly, by its plain terms, "section 1127(b) is an absolute bar to modification after substantial consummation."

*Id.* (quoting *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 922 (Bankr. D. Del. 2022)). As the Bankruptcy Court further explained, "Section 1127(b)'s prohibition of modification after substantial consummation provides both the debtor and creditors with finality as to confirmation orders." (Mem. Op. at 12 (quoting *In re Northtown Realty Co., L.P.*, 215 B.R. 906, 911-912 (Bankr. E.D.N.Y. 1998))). The Bankruptcy Court quoted further from the *Northtown* decision:

> To allow the continual modification of substantially consummated plans, by a new chapter 11 case or otherwise, would create uncertainty among creditors. Why would a creditor consent to the treatment of its claim as part of a plan of reorganization if it thought that treatment could later be modified and its claim further impaired? To allow a debtor to continuously file plans of reorganization which modified the prior confirmed and consummated plan would render § 1127(b) meaningless.

*Id.* (internal citations omitted); *see also In re Northampton Corp.*, 37 B.R. 110, 112-13 (Bankr. E.D. Pa. 1984) ("[T]he current $2,000,000 indebtedness owing to Manufacturers Hanover represents an express obligation imposed upon the debtor by the terms of the confirmed 1981 Plan. Nevertheless, the debtor . . . asserts that that obligation can now be discharged in the pending chapter 11 proceeding. To accept such rationale would . . . allow a debtor to continuously circumvent the provisions of a confirmed plan by filing chapter 11 petitions *ad infinitum.*"); *In re Jartran*, 886 F.2d

19

859, 869 (7th Cir.1989) (noting that the prohibition on modification after substantial consummation prevents "debtors from evading responsibilities under prior plans").

Thus, the Bankruptcy Court explained, "to the extent changed circumstances have any bearing on the outcome here, it is not due to an exception to the prohibition set forth in Section 1127(b)." (Mem. Op. at 13). "'Rather, consideration of the presence of unusual circumstances here is done only for purposes of determining whether the Debtors' filing of a second bankruptcy petition was done in good faith." (*Id.* (citing *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 493 (Bankr. S.D. Tex. 2013) (finding second bankruptcy case was filed to modify previous plans and concluding that "[t]he fact that there are no unanticipated changed circumstances necessitating the filing of the Second Case indicates that it was filed in bad faith."))). "Considering the overriding interest in protecting the finality of plans and confirmation orders," the Bankruptcy Court explained, "Debtors must show extraordinary, unforeseeable changed circumstances to avoid dismissal under Section 1112(b) of a second chapter 11 case that would result in a *de facto* modification of a previous plan." (*Id*. (citing *Triumph Christian Ctr.,* 493 B.R. at 489 ("Subsequent filings have only been permitted in very unusual, almost extraordinary, factual situations. Further, '[e]ven extraordinary and unforeseeable changes will not support a new Chapter 11, if these changes do not substantially impair the debtor's performance under the confirmed plan.'") (quoting *In re Adams*, 218 B.R. 597, 601-02 (Bankr. D. Kan. 1998)))).

In the context of the good faith inquiry, the Bankruptcy Court considered the Debtors' argument that the occurrence of extraordinary circumstances since Plan confirmation warranted a second bankruptcy filing for the purposes of modifying the Plan. Debtors cited the Lender's impractical demand that the Debtors sell the North Tower despite poor market conditions, and the City of San Jose's refusal to lift COVID restrictions that limited Hotel operations. The Bankruptcy

20

Court determined there was no genuine issue for trial as these events were foreseeable and none rose to the level of extraordinary.

First, the Lender's demand that Debtors market the North Tower in exchange for its concessions with respect to the sale of its collateral in the South Tower could not be unforeseeable in the context of the missed obligations and the parties' ongoing negotiations. *In re Roxy Real Estate Co.*, 170 B.R. 571, 576 (Bankr. E.D. Pa. 1993) ("Those courts which construe that second chapter 11 filings may be in good faith, despite the terms of an earlier confirmed plan, consistently hold that the default in the first plan cannot be attributed to events caused by the debtor, events which were known at the time of confirmation, or events which are generally foreseeable."). This Court agrees, based on the documents in evidence, that there was no genuine issue that the concessions set forth in the Side Letter were not extraordinary.

Second, any increased costs or limitations on Hotel operation attributable to the COVID-19 pandemic were foreseeable in August of 2021, when the Plan was confirmed where Debtors' First Bankruptcy Case was filed, and were, in fact, foreseen. The First Bankruptcy Case was filed because of the COVID-19 pandemic, the Plan was negotiated during the pandemic, and the Disclosure Statement specifically contemplated it. (App. 002965 ("Additional waves of the coronavirus pandemic could lead to new travel restrictions and reductions in economic activity, resulting in further disruptions to the Hotel's future operations and cash flow"); App.002909 ("[a]nalysts' forecasts predict a long recovery period for the entire hospitality sector")). There was no genuine issue as to whether the costs and limitations attendant to the pandemic were foreseeable.

### C.    The Debtors' Remaining Arguments Do Not Demonstrate an Abuse of Discretion

#### 1.    The Bankruptcy Court's Evidentiary Ruling Was Not An Abuse of Discretion

Debtors argue that the Bankruptcy Court abused its discretion by limiting the scope of discovery and evidence. (*See* D.I. 20 at 22). "The Court's rulings prevented a full evidentiary

21

record, precluding the [Debtors] from full access to all relevant documents relating to certain critical aspects of their Objection to the Motion to Transfer and Dismiss." (*Id*.). Those critical aspects included "how [Lender] characterized and treated the New Loan (i.e. whether it considered the loan to be a new loan)," and "the conduct in which [Lender] engaged that created the unforeseen changed circumstances warranting [Debtor's 2024] bankruptcy filing"—presumably Lender's demands in the Side Letter. (*See id*. at 23).

The Bankruptcy Court had broad discretion in managing discovery. *See, e.g.*, *In re Melilo*, 2015 WL 6151230, at *2 (D.N.J. Oct. 19, 2015) ("Trial courts retain broad discretion in managing discovery and case schedules") (internal citations omitted). Accordingly, the standard of review for an issue involving the scope of discovery is abuse of discretion. *See D'Agostino v. Domino's Pizza Inc.*, 2022 WL 1203816, at *1-2 (D.N.J. Apr. 20, 2022) (holding that a trial judge's decision on a discovery issue was reversible only for abuse of discretion). The abuse of discretion standard entitles the trial judge's decision to "great deference." *Kresefky v. Panasonic Commc'ns and Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J.1996).

With respect to Lender's treatment of the Plan Loan, the Bankruptcy Court did permit discovery: Lender produced SEC filings and its internal loan records, and Debtors deposed Lender's designated witness regarding same. But parole evidence showing how the Lender treated the Plan Loan was not needed in connection with the Bankruptcy Court's inquiry; whether the debt the Debtors sought to restructure was governed by the Plan was determined based on the unambiguous language of the Loan Documents, Plan, and Confirmation Order. With respect to Debtors' argument that they should have been given additional time to take discovery regarding their own change in circumstances, the Bankruptcy Court clearly considered whether this was needed in connection with the issue before it:

> COURT: But who would have that information?  It would be your
> clients, right? Not [the Lender] . . .
>
> What could they possibly know about the changed circumstances of
> Debtors that would have been adverse and precluded them from . . .
> being able to carry out what they were required to do under the plan.

(App.001554-1555).  The Debtors clarified that they needed discovery regarding "why the side letter

was demanded, when it was demanded," and the Bankruptcy Court ultimately exercised its

discretion to deny the request, as such discovery was not required: "The Side Letter exists . . . It's

either a change or it isn't."  (App.001555).  Simply put, the Bankruptcy Court determined that the

Debtors would not require extensive discovery from other parties in order to explain to the

Bankruptcy Court why they filed the 2024 Cases.  Debtors have not shown an abuse of discretion.

### 2. Debtors' Purported Willingness to Pivot to Liquidation Does Not Satisfy the Good Faith Filing Requirement

The Debtors argue that the Bankruptcy Court erred in dismissing the 2024 Cases in light of

substantial evidence that those cases were filed in good faith.  (*See* D.I. 21 at 41).  Specifically,

Debtors argue that the Bankruptcy Court ignored their argument that, if they were precluded from

restructuring the debt in the 2024 Cases, they were nonetheless permitted to pursue a liquidation in

the California Courts.  (*See* D.I. 20 at 7).[8]  Debtors rely on *Jartran* for the proposition that "[a]

second chapter 11 filing for the purpose of conducting a liquidation of a debtor's assets is permitted."

(D.I. 20 at 42 (citing *Jartran*, 886 F.2d at 859)).  In *Jartran*, there were no remedies granted to the

secured lender in a substantially consummated plan.  *See id*. at 861.  Instead, the plan in *Jartran*

provided only for the disposition of assets and administrative priority of rent claims.  *See id.*  Under

---

[8]   As Lender points out, at no point did Debtors actually seek to liquidate the Hotel or to convert their cases to chapter 7 cases.  Debtors submitted no evidence they had hired a real estate broker to market the Hotel or any other evidence that would demonstrate an intent to pivot to a liquidation (as distinguished from arguments by counsel that they should be allowed to do so).  Rather, through this litigation, Debtors delayed Lender's foreclosure sale to May 12, 2025, ten months after the Notice of Default.

these facts, the Seventh Circuit permitted a second petition, notwithstanding the existence of a confirmed plan in the first bankruptcy case, where the debtors filed the second petition for an entirely distinct purpose, such as liquidation. *Id*. at 867-70. The Bankruptcy Court distinguished *Jartran* during the February 2, 2025 hearing on Debtors' Reconsideration Motion:

> But in the Seventh Circuit decision, there was nothing in that plan that provided for the remedies that would occur if there was a further default. Here, there was. The lenders are given the opportunity to foreclose if — under the plan, if there was a default, further default. And there was a further default. So, by filing a new bankruptcy case, with the goal of either reorganizing or liquidating, you're attempting to avoid what has been approved by this Court.

(App.001749–1750 (cleaned up)). This Court agrees that *Jartran* is distinguishable based on facts specific to that case, and the alternative purpose of liquidation does not assist the Debtors in establishing their good faith in filing the 2024 Cases.

### 3. The Bankruptcy Court's Decision to Dismiss the Cases Was Not an Abuse of Discretion

Once a chapter 11 is found to have been filed in bad faith, the decision as to whether to "convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter" is left to the discretion of the bankruptcy judge. Fed. R. Bankr. P. 1014(b). This decision is reviewed by a district court for abuse of discretion. *Myers*, 491 F.3d at 127 ("the decision whether to convert the case lies within the sound discretion of the Bankruptcy Court, just as does the decision whether to dismiss the case outright"); *In re Alston*, 2013 WL 6210249, at *4 (E.D. Pa. Nov. 27, 2013) ("The Bankruptcy Court has considerable discretion in determining whether to dismiss or convert a case to Chapter 7") (citing *SGL Carbon*, 200 F.3d at 159).

The Plan Loan was due and payable upon acceleration for failure to pay interest when due in June of 2024 and, even without acceleration, fully matured November 8, 2024. Under the Plan and Loan Documents, incorporated by reference into the Confirmation Order, Lender was provided

24

with a remedy: foreclosure under state law.  The 2024 Cases blocked the exercise of that remedy, which violated Section 1127(b).  Dismissal was appropriate here, where the 2024 Cases had already imposed months of delay, and conversion would have increased the delay.  In any event, Debtors offer nothing to show that the Bankruptcy Court abused its discretion in dismissing the cases rather than converting them to cases under Chapter 7.

Debtors' additional argument (C.A. No. 25-176 (MN), D.I. 14 at 44) that the bankruptcy of NEX should be treated differently, even though it was filed for the purpose of circumventing Lender's rights under the Plan, is not supported by any authority.  Debtors appear to argue that the NEX bankruptcy case could not be transferred and dismissed for lack of good faith, as implicit in the Bankruptcy Court's Memorandum Opinion, because it was not a debtor in the First Bankruptcy Cases.  This Court disagrees.

## III.    CONCLUSION

For the reasons set forth herein, the Transfer Order and Dismissal Order will be affirmed. An appropriate order will be entered.